**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Samson C.C.,<br><br>Petitioner,<br><br>v.<br><br>David Easterwood, Director of St. Paul Enforcement and Removal Operations, Immigration and Customs Enforcement; Markwayne Mullin, Secretary of the Department of Homeland Security; Warden, Fort Snelling Whipple Building; Todd Lyons, Acting Director, U.S. Immigration and Customs Enforcement; and Todd Blanche, Attorney General of the United States;<br><br>Respondents. | No. 26-cv-3588 (KMM/DTS)<br><br>**ORDER** |

---

This matter is before the Court on Petitioner Samson C.C.'s Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241. Pet., Dkt. 1. Mr. C.C. is a citizen of Zimbabwe who has lived in the United States for more than thirty years. He lives with a human immunodeficiency virus (HIV) infection and requires access to medical treatment for his condition. Although he was ordered removed from the United States in January 2004 after overstaying a visitor visa, he received protection from removal to Zimbabwe. Since receiving the 2004 removal order, the government has not deported him. Instead, Mr. C.C. has lived continuously in Minnesota under the supervision of immigration authorities, worked for decades, built ties with his community, and complied with reporting requirements imposed on him by Immigration and Customs Enforcement (ICE). However, on August 6, 2026, ICE took Mr. C.C. into custody at an ICE check-in appointment, and he has been confined in the Sherburne County Jail since that day. Respondents detained Mr. C.C. because they intend to remove him to a "third country" –

Uganda. Mr. C.C. seeks an order enjoining his removal to Uganda or any other "third country" absent adequate notice and an opportunity to raise claims seeking protection from removal there and requiring Respondents to immediately release him subject to the same conditions of supervision immigration authorities previously imposed. For the reasons discussed below, the petition is granted in part and denied in part.

## I. BACKGROUND

### A. Petitioner's Entry to the United States and Removal Order

Mr. C.C. is a native and citizen of Zimbabwe who has lived in the United States since December 1995. He entered the United States in New York on a visitor visa to assist and care for a fiancée who had suffered a stroke. Since coming to the United States, Mr. C.C. has had his own serious health complications. In 1997, he was hospitalized after receiving a cancer diagnosis, and during that same period he was diagnosed with HIV and immediately began treatment. Since that diagnosis, Mr. C.C. has consistently treated his HIV with medication and regular attendance and medical appointments, and has managed to remain virally undetectable for years.

Mr. C.C.'s visitor visa from December 1995 allowed him to stay in the United States until no later than June 24, 1996. Because he overstayed his visa, in June 2002, United States Citizenship and Immigration Service (USCIS) issued Mr. C.C. a notice to appear and charged him as removable under 8 U.S.C. § 1227(a)(1)(B). Resp. Ex. A, Dkt. 13-1. On January 7, 2004, an Immigration Judge (IJ) ordered Mr. C.C. removed from the United States. The IJ granted Mr. C.C.'s claim for withholding of removal to Zimbabwe, which was based, in part, on his HIV-positive status. Pet. ¶ 61. The removal order indicated that he could be removed "to any country other than Zimbabwe that will accept him." Resp. Ex. B, Dkt. 13-2. Two days later, ICE issued a Form I-205 Warrant of Removal, but it was not executed. *See* Resp. Ex. C, Dkt. 13-3.

### B. Petitioner's Order of Supervision, Revocation, and Recent Arrest

Because he was not removed, ICE released Mr. C.C. into the community, subject to an order of supervision (OSUP). Pet. ¶ 65. His OSUP notes that he was ordered removed in 2004 and sets the conditions of his release, including that he appear upon a request from ICE for any appointments and, as appropriate, for removal from the United States. *See* Resp. Ex. D, Dkt. 13-4.

Mr. C.C.'s release on supervision went on for years without incident, and he regularly attended check-ins with ICE and kept the agency apprised of his whereabouts. Shortly before the events giving rise to the petition in this case, Mr. C.C. appeared for an ICE reporting appointment and ICE personnel informed him that his next reporting date would not be until February 2027. Pet. ¶¶ 66, 68–69. However, on August 5, 2026, ICE issued Mr. C.C. a call-in letter directing him to appear on August 6, 2026 for a check-in with the agency. At that meeting, ICE officers took Mr. C.C. into custody. ICE did not identify any violation of Mr. C.C.'s reporting requirement, any new criminal conduct, or any other violation of his OSUP conditions of release. Pet. ¶¶ 77.

On August 6, ICE served Mr. C.C. with a notice of revocation of release indicating that his release was revoked pursuant to 8 C.F.R. § 241.13(i). Resp. Ex. E, Dkt. 13-5. The notice stated that the reason for the revocation is that circumstances had changed making his removal likely to occur in the reasonably foreseeable future because his "case is under review for removal to an alternate country." Resp. Ex. E, Dkt. 13-5. That same day, a deportation officer conducted an informal interview of Mr. C.C. He provided the following written statement regarding his desire to remain in the United States and the reason for the revocation of his supervised release:

> Medical condition would be a great disadvantage. Laguage would be comfortable in English environment. And would need access to

> my property. I never committed any crime. I love U.S.A. And I am loyal to this country since I have been since 1995. I am asking for mercy to remain in USA. Please I am a Christian.
>
> My life has been saved [by] the mighty USA medical world of highly professionals. Without the USA my life is not going to be that long. I work. I pay taxes. I haven't asked for disability because I believe in working regardless of my painful condition. I am thankful and ask for you to have a second consideration for me to stay in USA.

Resp. Ex. F, Dkt. 13-6.

**C. The Petition and Procedural History**

On August 10, 2026, in the late afternoon, ICE notified Mr. C.C. that it intended to remove him to Uganda, with his removal staged by early morning on August 11. On August 11, Mr. C.C.'s counsel filed the petition for a writ of habeas corpus, and having been notified of the government's intent to remove Mr. C.C. to Uganda, his counsel sought a temporary restraining order. Mot. for TRO, Dkt. 4. The Court granted the TRO, in part, on August 11, 2026, temporarily enjoining Respondents from removing Petitioner pending completion of briefing on the motion. Order (Aug. 11, 2026), Dkt. 6. On August 14, 2026, ICE took Mr. C.C. off a flight manifest to execute his removal in compliance with the Court's temporary restraining order. Santiago Decl. ¶ 15, Dkt. 13. On August 14, 2026, Respondents filed a response to the petition and Mr. C.C.'s motion for a temporary restraining order. Resp., Dkt. 12[1]; Santiago Decl., Dkt. 13. Mr. C.C. filed a reply in support of the petition on August 15, 2026. Pet'r Reply, Dkt. 14.

[1] In certain places, Respondents' answer to the Petition contains clear errors. For example, it mentions removal of Petitioner to Laos, Resp. at 8, 9, 12, and Petitioner's "lengthy criminal history," *id.* at 11. But this case has nothing to do with Laos, nor is there any showing that Mr. C.C. has any criminal history.

## II. Third Country Removal Legal Framework

### A. Removal Proceedings

The government ordinarily removes noncitizens from the United States through removal proceedings that take place before an Immigration Judge (IJ). 8 U.S.C. § 1229a. Among other powers, the IJ has the authority to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." *Id.* § 1229a(b)(1); 8 C.F.R. § 1240.10(a). The noncitizen may be represented by counsel, receives a reasonable opportunity to review the evidence against him, can present evidence in his own behalf, and may cross-examine the government's witnesses. 8 U.S.C. § 1229a(b)(4). Based on these procedures, the IJ determines whether the noncitizen is subject to removal under the nation's immigration laws and, if so, the location to which the noncitizen will be removed. 8 U.S.C. § 1231(b)(2); 8 C.F.R. § 1240.10(f).

Regarding the country of removal, the Immigration and Nationality Act (INA) provides first that the noncitizen to the country he designates. 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the individual does not designate a country of removal, the IJ must select among other possible destinations. 8 U.S.C. § 1231(b)(2)(D); 8 C.F.R. § 1240.10(f). A noncitizen in removal proceedings is notified on the record of the destinations to which removal may be made. 8 C.F.R. § 1240.10(f) ("The immigration judge shall also identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [8 U.S.C. § 1231(b)(2)] of the [INA] if the country of the alien's designation will not accept him or her into its territory[.]").

When the IJ decides among alternative countries of removal, the first choice will be to remove him "to a country of which the alien is a subject, national, or citizen," unless that country will not accept the individual or fails to advise the immigration authorities whether it will accept him. 8 U.S.C. § 1231(b)(2)(D). Next, if the individual cannot be removed to that destination, the IJ will select from other alternative removal countries depending on the person's connections to them, such as the country from which the person was admitted to the United States or the country where the individual was born. 8 U.S.C. § 1231(b)(2)(E)(i)–(vi). Finally, "[i]f [it is] impracticable, inadvisable, or impossible to remove the alien to each country" that is an option based on having some connection to the person, the IJ can order removal to "another country whose government will accept the alien in that country." 8 U.S.C. § 1231(b)(2)(E)(vii). See also *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005) (identifying the four progressive "removal commands" set forth in 8 U.S.C. § 1231(b)(2)).

**B. Protection from Removal**

Federal immigration law includes several provisions that can restrict the countries to which a noncitizen may be removed. An alien can ask for protection from removal under the regulations implementing our nation's obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85; *see also* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G, § 2242(a)–(b) (stating that it is the policy of the United States not to return a person involuntarily to a country where the person would

be in danger of being subjected to torture and requiring implementation of regulations to implement obligations under CAT). Federal law expressly prohibits DHS from "remov[ing] an alien to a country if the [DHS Secretary[2]] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

During removal proceedings, a noncitizen is entitled to request asylum, withholding of removal, and CAT protections. 8 C.F.R. § 1240.11(c)(1). Some of these protections are discretionary, but others are mandatory. Withholding of removal is one of the mandatory protections that prevents deportation to a country or countries where an IJ finds that the person is more than likely to be persecuted. 8 U.S.C. § 1231(b)(3)(A). And CAT protection is also a mandatory protection against removal to a country where the IJ finds that the individual is likely to be tortured. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) (explaining that immigration authorities have "no discretion to deny relief to a noncitizen who establishes his eligibility" for CAT protection).

When the IJ identifies a country or alternative countries of removal in a removal order, that "does not limit the authority of [DHS] to remove the alien to any other country as permitted by [§ 1231(b)]." 8 C.F.R. § 1240.12(d). And DHS is not prohibited "from removing an alien to a third country other than the country to which removal has been

[2] Section 1231 formerly vested authority in the Attorney General, but that power is now exercised by the Secretary of the Department of Homeland Security. *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 338 n.1 (2005).

withheld or deferred" under withholding-of-removal proceedings. 8 C.F.R. § 1208.16(f). Thus, even when a person has demonstrated that he should not be removed to a specific country based on the likelihood that he will be tortured and, therefore, obtains relief in the form of withholding of removal to that country under CAT, he "still 'may be removed at any time to another country where he or she is not likely to be tortured.'" *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020) (citing 8 C.F.R. §§ 1208.17(b)(2), 1208.16(f)).

**C. Third-Country Removal and Petitioner**

Two developments in the first half of 2025 impact the third-country-removal issues in this case. In February of 2025, DHS issued a policy directive instructing the Enforcement and Removal Operations (ERO) division of ICE to review the cases of noncitizens granted withholding of removal or protection under the CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained." February 18, 2025 DHS Policy Directive on Expedited Removal and Nondetained Docket (Feb. 18, 2025), https://perma.cc/T8TV-GT84; *see also D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 367 (D. Mass. 2025) [hereinafter *D.V.D. I*]. According to the February policy directive, the impetus for this reexamination was, in part, that the government had achieved "significant gains with regard to previously recalcitrant countries and the potential for third country removals." *See D.V.D. I*, 778 F. Supp. 3d at 367 (quoting the February policy directive).

Then, on March 30, 2025 former DHS Secretary Kristi Noem issued a memorandum entitled *Guidance Regarding Third Country Removals* (Mar. 30, 2025)

(hereafter "March 2025 Guidance").[3] According to the March 2025 Guidance, before a noncitizen is removed to a country that has not previously been identified as the country to which he will be removed, "DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured," and if DHS has such assurances, the noncitizen may be removed without any additional procedures. March Guidance at 1–2. If the third country destination has not provided credible assurances, then DHS will provide the noncitizen with a notice of removal to that country. DHS will not ask whether the alien is afraid of being removed there, but if he expresses such a fear, DHS will refer him to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under the Immigration and Nationality Act and the Convention Against Torture. *Id.* at 2. If the USCIS officer conducting the screening does not believe that the noncitizen is likely to be persecuted based on a statutorily protected ground or tortured in the alternative country under consideration, then the individual will be removed there. *Id.* If a USCIS officer determines that the individual is likely to be persecuted or tortured in the removal country, and the noncitizen was in now-concluded removal proceeding in immigration court, ICE will be notified by USCIS and may file a motion to reopen the proceedings or elect to designate another country for removal. *Id.*

[3] A copy of the March 2025 Guidance is not included in the record. However, in other cases raising similar issues, the government has provided the following link to a copy of the document online: https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf (last visited September 17, 2026).

On July 9, 2025, ICE issued further guidance ("the July 9 Guidance") on how to implement DHS's March 2025 Guidance. Pet. ¶ 50. The July 9 Guidance is identical to the March 2025 Guidance except that, in cases where diplomatic assurances from the destination country do not exist, it instructs immigration agents to serve a "Notice of Removal" that identifies the removal country and translates the notice for the noncitizen. *See id.* It further provides that DHS may remove the individual within 24 hours after the notice has been served, though in undefined "exigent circumstances," DHS can execute removal to a third country within 6 hours of serving the notice. *Id.* ¶ 51. See also *Esmaeili v. Noem*, No. 26-CV-0203-GPC-JLB, 2026 WL 240661, at *6 (S.D. Cal. Jan. 29, 2026) (discussing the July 9 Guidance).

As discussed, Mr. C.C.'s removal order is from 2004, and it indicates that he cannot be removed to Zimbabwe. However, it states that he can be removed to any other country that is willing to accept him. During Mr. C.C.'s 2004 removal proceedings, Uganda was not identified as a potential country of removal, and no individualized evidence concerning his safety in Uganda was considered. Pet. ¶¶ 92–93. No IJ has otherwise assessed any fear-based claim regarding Mr. C.C.'s removal to Uganda. Pet. ¶ 96. Mr. C.C.'s counsel has not received notice identifying the statutory provision under which Uganda was selected as a removal destination, the evidence that Uganda has agreed to accept him, the anticipated timing of removal, or the procedures by which Mr. C.C. can obtain meaningful review of a Uganda-specific protection claim. Pet. ¶ 97.

## III. DISCUSSION

Mr. C.C. raises several claims in his petition. First, he claims that Respondents violated statutory and regulatory requirements when they revoked his order of supervision. Second, Mr. C.C. asserts that the procedures followed in connection with the revocation of his OSUP violated his procedural due process rights. Third, he alleges that his recent detention violates the rules established in *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). Fourth, he claims that the government's effort to remove him to Uganda without meaningful notice and an opportunity to present a fear-based claim regarding that country violates the standards of 8 U.S.C. § 1231(b) and implementing regulations. Fifth, Mr. C.C. asserts that his arrest was made without a valid administrative warrant and did not comply with the requirements of 8 U.S.C. § 1357(a)(2). Finally, Mr. C.C. claims that Respondents violated the Administrative Procedure Act (APA) by taking agency action that is contrary to law, in excess of statutory authority, arbitrary and capricious, and without observing required procedures.[4]

As explained below, the Court grants Mr. C.C.'s petition, though it does not agree with all of his arguments for relief.

### A. Habeas Corpus Standard

Under 28 U.S.C. § 2241, the Court may grant a writ of habeas corpus for a petitioner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The right to challenge the legality of a person's

[4] The Court finds it unnecessary to separately analyze Mr. C.C.'s APA claim because it is coextensive with the other regulatory challenges in this case.

confinement through a habeas petition extends to cases involving immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 900–01 (D. Minn. 2020). The petitioner has the burden to prove that his detention is illegal by a preponderance of the evidence. *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 965 (D. Minn. 2025).

The extent of federal courts' jurisdiction over habeas claims is traditionally to consider "release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). However, "immediate physical release [is not] the only remedy under the federal writ of habeas corpus." *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025). In some circumstances, a district court presiding over a habeas case has the authority to hear a claim seeking an injunction against removal if that claim presents a pure question of law. *Jama v. Immigration and Naturalization Serv.*, 329 F.3d 630, 632 (8th Cir. 2003).

**B. The OSUP Revocation Claim**

The Court begins with Mr. C.C.'s claim that Respondents failed to comply with the regulation that governs such decisions and, therefore, violated his procedural due process rights. Specifically, he contends that Respondents did not follow the requirements of 8 C.F.R. § 241.13(i) when they revoked his OSUP because they did not provide an adequate statement of the reasons for the revocation.

As the Supreme Court held in *Zadvydas*, the government cannot detain a noncitizen indefinitely when it is unable to remove him from the United States. 533 U.S. at 699–700. Federal regulations provide that ICE must release an individual ordered removed when there is no significant likelihood of removal in the reasonably foreseeable

future. 8 C.F.R. § 241.13(g)–(h). When ICE releases a person on an OSUP, its "ability to re-detain that noncitizen is constrained" by § 241.13(i). *Roble v. Bondi*, 803 F. Supp. 3d 766, 771 (D. Minn. 2025). Because there is no evidence Mr. C.C. violated any of the conditions of release, 8 C.F.R. § 241.13(i)(1) does not apply here, and the relevant provision is 8 C.F.R. § 241.13(i)(2), which governs revocation and re-detention for the purposes of removal. Paragraph (i)(2) states that DHS "may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2).

The regulation further provides that "[u]pon revocation, the alien will be notified of the reasons for revocation of his or her release," and DHS "will conduct an initial informal interview promptly after his or her return to … custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). And the noncitizen is allowed to provide "any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future[.]" *Id.*; *see also Roble*, 803 F. Supp. 3d at 771 (discussing the requirements of 8 C.F.R. § 241.13(i)(2), (3)).

Here, Mr. C.C. argues that the statement in the notice of revocation of his OSUP was inadequate for purposes of 8 C.F.R. § 241.13(i)(3) because it merely advised that his case was under review for removal to an alternate country, but did not indicate what the alternate country was, explain that Uganda had allegedly accepted Mr. C.C.'s removal,

nor identify the circumstances that caused ICE to conclude that removal was likely in the near future. Pet'r Reply at 20–21.

If the government were to provide the additional information that Mr. C.C. complains is lacking from the notice he received in this case, it would have gone a long way toward ensuring that he had an opportunity to inform the immigration authorities of the reasons why he contests the likelihood he can be removed in the reasonably foreseeable future. But the level of detail Mr. C.C. demands of the notice is not expressly required by the regulation, which merely required DHS to inform him of "the reasons for revocation of his … release." 8 C.F.R. § 241.13(i)(3). The language in Mr. C.C.'s notice did not simply provide boilerplate language saying that his revocation had been revoked based on changed circumstances, nor did it merely recite the language of the regulation. *See Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 783 (D. Minn. 2025) (finding the notice of revocation insufficient where it stated only that a review of the petitioner's file indicated there were "changed circumstances" in his case and there was "a significant likelihood of removal in the reasonably foreseeable future"); *Roble v. Bondi*, 803 F. Supp. 3d 766, 772 (D. Minn. 2025) ("Providing a notice that simply recites the language of the regulation

does not satisfy the Government's obligation to provide the reasons why the petitioner's Order of Supervision was revoked.") (cleaned up).[5]

To the extent Mr. C.C. argues that the revocation of his order of supervised release was unlawful because he was not notified until several days after he was taken into custody that he would be removed to Uganda, specifically, the Court finds that issue is better addressed in connection with Mr. C.C.'s third-country-removal claim.

Accordingly, the Court concludes that Mr. C.C. claim that Respondents failed to comply with 8 C.F.R. § 241.13(i) does not require an order releasing him from custody.

**C. The Unlawful Arrest Claim**

Petitioner also claims that he is entitled to release because ICE officers took him into custody on August 6, 2026 without a warrant and have not demonstrated that a warrantless arrest in this case complied with 8 U.S.C. § 1357(a)(2). Pet., Count V. However, the record in this case demonstrates that Respondents took Mr. C.C. into custody based on a revocation of his order of supervision and an assertion that there had been a change in circumstances making his removal reasonably foreseeable in the near future. And in doing so, Respondents were entitled to rely on the existence of the unexecuted Form I-205 Warrant of Removal that accompanied Mr. C.C.'s 2004 final

---

[5] Other cases relied on by Mr. C.C. are unavailing for similar reasons: they involved entirely conclusory statements that merely parroted the language of the regulation. *E.g.*, *Pham v. Warden*, 833 F. Supp. 3d 1092, 1107 (E.D. Cal. 2026) (finding a notice of revocation that repeated the language of § 241.13(i)(3) was too "vague and conclusory"); *Claudio A.A. v. Bondi*, No. 26-CV-742 (KMM/LIB), 2026 WL 468232, at *6 (D. Minn. Feb. 12, 2026) ("Respondents also fail to identify any 'changed circumstance' to support the conclusion that there is now a significant likelihood of Petitioner's removal in the reasonably foreseeable future."), *report and recommendation adopted,* No. 26-CV-742 (KMM/LIB), 2026 WL 478347 (D. Minn. Feb. 18, 2026).

order of removal. Accordingly, for the same reasons this Court recently explained in *Ansumana S. v. Blanche*, No. 26-cv-3371 (KMM/DJF), 2026 WL 2606655 (D. Minn. Sept. 3, 2026), the Court finds that Mr. C.C. is not entitled to a writ of habeas corpus based on his unlawful-arrest claim. *Id.* at *7–8 (concluding that the petitioner's arrest was not unlawful where an order of supervision was revoked in accordance with 8 C.F.R. § 241.13 and where the respondents possessed a Form I-205 warrant from several years before that was never fully executed because the petitioner was never removed from the United States).

**D. The Third-Country Removal Claim**

Mr. C.C. alleges that the government's efforts to remove him to Uganda or another third country violate his right to due process of law under the Fifth Amendment because he has not been provided meaningful notice and an opportunity to raise a claim regarding a reasonable fear of torture or persecution connected to such a destination. In a similar case, this Court has recently analyzed the issue of third-country removal where the petitioner has never been provided a credible-fear interview with an asylum officer and never had the opportunity to raise a fear-based claim related to the specified country before an immigration judge in removal proceedings. *Asumana S. v. Blanche*, No. 26-cv-3371 (KMM/DJF), 2026 WL 2606655 (D. Minn. Sept. 3, 2026). The Court concluded that the Due Process Clause requires Respondents to do more than they have here. *See id.* at *7–15. The Court incorporates that same analysis here, including its jurisdictional conclusions and its evaluation of the merits of the due process claim. *Id.* Therefore, the Court concludes that Mr. C.C.'s due process rights have been violated, and he cannot be

removed to Uganda or another third country without greater procedural protections than he has so far received. *Id.*; *see also Kumar v. Wamsley*, 817 F. Supp. 3d 1059 (W.D. Wash. 2025); *Nguyen v. Scott*, 796 F. Supp. 3d 703 (W.D. Wash. 2025); *Sagastizado v. Noem*, 802 F. Supp. 3d 992 (S.D. Tex. 2025); *Romero v. Ladwig*, No. 25-cv-1106-JWD-EWD, 2026 WL 1146824, at *15 (M.D. La. Apr. 21, 2026), *Esmaeili v. Noem*, No. 26-CV-0203-GPC-JLB, 2026 WL 240661, at *6 (S.D. Cal. Jan. 29, 2026); *Folashade O. v. Schilling*, No. 26-cv-2705 (LMP/DTS), 2026 WL 1734877, at *4 (D. Minn. June 16, 2026); *Pacheco v. Baltazar*, No. 26-cv-01176-PAB, 2026 WL 1223414 (D. Colo. May 5, 2026); *Aden v. Nielsen*, 409 F. Supp. 3d 998 (W.D. Wash. 2019).[6]

Accordingly, the Court grants Mr. C.C.'s petition to the extent that he claims his due process rights have been violated in connection with the government's efforts to remove him to Uganda, and enjoins his removal unless and until the Respondents have provided him meaningful notice and an opportunity to be heard.

---

[6] Respondents have not meaningfully responded to Petitioner's third-country removal claim. The sum total of their response to that claim is the assertion that "[t]his is not technically removal to a third country, because the removal order prohibited removal to Zimbabwe. … Petitioner at all times knew that he would be removed to another country. Here, Uganda has been the country chosen and the Petitioner has not provided any argument against removal to Uganda." Resp. at 12. But the fact that the government selected Uganda as an alternate country says nothing about whether the way in which it did so satisfies the constitutional requirements of due process. Because Respondents have presented no argument to contest Mr. C.C.'s due process challenge regarding third-country removal, it has "waived any challenge" to this claim. *See Folashade O. v. Schilling*, 2026 WL 1734877, at *4 (D. Minn. June 16, 2026) (finding that the respondents' failure to address the petitioner's "due process claim as it relates to third-country removal … alone warrants relief for [the petitioner] on this claim") (citing *Estephanny P. v. Bondi*, No. 26-cv-198 (ECT/JFD), 2026 WL 115067, at *1 (D. Minn. Jan. 15, 2026)).

**E. *Zadvydas* Claim**

Mr. C.C. finally claims that his continued detention in this matter violates his due process rights as established in *Zadvydas v. Davis*, 533 U.S. 678 (2001). Pet., Count III. After his removal order became final in 2004, he was not immediately removed, nor did the government deport him within the 90-day removal period in which detention is mandatory. Nor did the government remove him within the next 90 days that followed the expiration of the removal period. Instead, he was released on an OSUP because his removal was not significantly likely in the reasonably foreseeable future. Given that history, Mr. C.C. asserts that the presumptively reasonable period for post-removal-order detention under *Zadvydas* has already expired, and his recent re-detention in August 2026 does not reset the *Zadvydas* clock or provide Respondents with presumptively reasonable authorization to detain him for another six months. Pet. ¶¶ 162–74. Instead, he argues that Respondents cannot demonstrate that there is a significant likelihood of removal in the reasonably foreseeable future, and their plans to remove him to Uganda do not qualify. *Id.*

Respondents suggest that Petitioner's claim for release from custody pursuant to the *Zadvydas* framework is premature because he was only recently re-detained, and *Zadvydas* itself recognizes that detention following a final order of removal is

presumptively reasonable for a period of six months. *See* Resp. at 4,[7] 10. However, most courts considering the issue under the circumstances presented here have rejected the notion that the six-month period of presumptively reasonable post-removal-order detention resets. *See, e.g.*, *Khazanov v. Bullock*, No. 3:26-cv-00401, 2026 WL 1603304, at *7–8 (M.D. Tenn. June 4, 2026) (recognizing that courts have concluded the presumptively reasonable *Zadvydas* "detention period is not reset when a non-citizen is *re-detained* long after the expiration of the original detention period under § 1231") (citing cases); *Qu v. Mullin*, No. 5:26-cv-01302-CAS-AGR, 2026 WL 836681, at *3 (C.D. Cal. Mar. 26, 2026) (same) (citing cases); *Nguyen v. Noem*, No. 5:25-CV-176, 2026 WL 237282, at *7 (S.D. Tex. Jan. 28, 2026) (same) (citing cases); *Siguenza v. Moniz*, No. 25-CV-11914-ADB, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025) (same) (citing cases).

Under the ordinary *Zadvydas* framework, a noncitizen has the initial burden to show "good reason to believe that there is no significant likelihood of removal in the reasonable foreseeable future," and once he has done so, the burden shifts to the

[7] Respondents argue that "the 90-day removal period is applicable here since [Mr. C.C.] was redetained on August 6, 2026, as such this Court lacks jurisdiction to review his current detention and should dismiss this habeas petition." Resp. at 4. However, Respondents do not cite any case that concludes a federal district court lacks jurisdiction in these circumstances, nor do they point to any case that concludes a new 90-day removal period with its related detention begins anew when the government revokes an order of supervision and takes an individual back into custody pursuant to 8 C.F.R. § 241.13.

government to rebut that showing. *Zadvydas*, 533 U.S. at 701.[8] Here, the Court concludes that Mr. C.C. has made the necessary showing, and Respondents have not rebutted it.

The record is clear that Mr. C.C. cannot be removed to Zimbabwe because of his grant of withholding of removal. Mr. C.C. has met his relatively minimal burden to show that his removal is not reasonably foreseeable because the government has been unable to remove him from the United States for many years, it took no steps to deport him until quite recently, and when it pursued his removal to a different country, it did so without any process to ensure that he is not removed to a location that federal law prohibits. *See* 8 U.S.C. § 1231(b)(3)(A) (providing that the government "may not remove the alien to a country if [DHS] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"). Respondents have presented evidence that Uganda is willing to accept Mr. C.C., and they took steps to effect his removal there, including scheduling him on a deportation flight. But this neither undermines Mr. C.C.'s initial showing, nor demonstrates a significant likelihood of removal in the reasonably foreseeable future.

---

[8] Some courts have concluded that when ICE re-detains a person following revocation of supervised release, ICE has the burden to show a significant likelihood of removal regardless of the petitioner's initial showing. *See Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) (explaining that under the regulations adopted after *Zadvydas* was decided, it is the government's "burden to show a significant likelihood that the alien may be removed" when an alien is re-detained upon revocation of release); *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 149 (D. Mass. 2025) (same); *Khazanov*, 2026 WL 1603304, at *9–11 (same). The Court need not decide the issue in this case because Mr. C.C. has made the required initial showing.

So far, Respondents have done none of the things due process requires. Respondents took no steps to advise Mr. C.C. that he could object to removal to Uganda if he had a reasonable fear of persecution or torture there. Nor did they provide Mr. C.C. with a reasonable-fear interview when they determined that Uganda might be a destination. After they confirmed that Uganda would take Mr. C.C., they did not schedule him for a hearing before an IJ. In other words, the record establishes that Mr. C.C. has never had an opportunity to obtain a neutral adjudication of any fear-based claim regarding removal to Uganda. Respondents cannot lawfully remove Mr. C.C. to Uganda (or another third country) without affording him the process he is entitled to receive under the Constitution and the laws of the United States.

There is at least some possibility that, after the process required by law and imposed by the provisions of this order takes place, Respondents may be able to lawfully remove Mr. C.C. to Uganda or some other country. "But that is not the same as a significant likelihood that he will be [removed] in the reasonably foreseeable future." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 725 (W.D. Wash. 2025) (citing *Zadvydas*, 533 U.S. at 701); *Sanchez v. Noem*, No. 5:25-CV-00104, 2025 WL 3760317, at *10 (S.D. Tex. Nov. 14, 2025) ("Some possibility of an eventual removal is not the same as a significant likelihood that removal will occur in the reasonably foreseeable future."). The Court concludes that for now, his release is required.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1. The Petition for a Writ of Habeas Corpus (Dkt. 1) is **GRANTED** as stated in this Order.

2. Respondents shall **IMMEDIATELY RELEASE** Petitioner subject to the same conditions of supervision immigration authorities previously imposed under his 2004 Order of Supervision.

3. **Within 24 hours after Respondents release Petitioner from custody**, Respondents shall file a notice informing the Court that his release has taken place.

4. Respondents are **ENJOINED** from removing Petitioner to Uganda or to any country not designated on his order of removal without providing him meaningful notice and opportunity to assert a fear-based claim before an immigration judge. Specifically:

   a. Respondents must provide Petitioner with a reasonable fear interview concerning Uganda if he states a fear of removal within 10 days of this Order.

   b. If Respondents determine that Petitioner states a reasonable fear of removal to Uganda, then Respondents must move to reopen his removal proceedings for him to present a claim for withholding of removal or deferral of removal under the CAT to an immigration judge;

   c. If Respondents determine that Petitioner does not state a reasonable fear of removal to Uganda, then Respondents must allow Petitioner 15 days to file a motion to reopen his removal proceedings before removing him.

   d. With respect to removal to any other alternate country besides Uganda, Respondents must provide written notice of removal to that country at least 10 days prior to the removal and ask whether Petitioner has a fear of removal to the third country. If the Petitioner expresses such a fear, then Respondents must provide a reasonable fear interview to screen for Petitioner's fear of persecution and torture. If Petitioner is found to have a reasonable fear of removal to that country, Respondents must move to reopen Petitioner's removal proceedings to allow Petitioner to present a claim for withholding of removal or deferral of removal under the CAT to an immigration judge. If Petitioner is found not to have such a fear,

Respondents must allow an additional 15 days from such determination for Petitioner to file a motion to reopen his removal proceedings before removing him.

**Let Judgment be entered accordingly.**

Date: September 17, 2026

*s/Katherine Menendez*
Katherine Menendez
United States District Judge